IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| CEDRIC DEWIN JENKINS | : | 1:13CR487-2 |
| DORICK TAVARES HUNT | : | 1:13CR487-3 |
| KEVIN KEYS, also known as | : | 1:13CR487-4 |
| "Swag" | : | |

SUMMARY OF FACTS

NOW COMES the United States of America by and through
Ripley Rand, United States Attorney for the Middle District of
North Carolina, and hereby files this trial brief for the
Court's consideration, and states the following:

I.   STATEMENT OF FACTS

On January 2, 2012, the United States Forestry Service
("USFS") investigated the breaking and entering of three
vehicles in the Pisgah National Forest. The victims reported
that their car windows had been shattered and their personal
belongings stolen, including various means of identification and
checkbooks.

On January 25, 2012, the Asheville Police Department
arrested Vicki Lynn Brantley for passing forged checks with

1

stolen identification and found her in possession of the identification and documents that were stolen on January 2. They further recovered a handwritten note listing personal-identifying details for the victim K.H.

USFS Special Agent Jenny Davis later interviewed Brantley, who admitted to her involvement with an organized theft ring operating in the southern region of the United States known to law enforcement as the "Felony Lane Gang." Brantley identified individuals named "Twin" and "Swag" (or "Swagg") (later identified from photographs as Jermaine Jenkins and Kevin Keys) as her bosses and the leaders of this group.

Brantley provided specific details of the conspiracy. She stated that the ring would make up to $10,000 a day, and that she received a ten percent share of the proceeds. The fraud group would stay in one town for one or two weeks until it got "hot." When cashing stolen checks, Brantley would pull into the drive-through lane at the bank farthest from the bank teller. One of her co-conspirators would be nearby in a different car. After Brantley left the bank, she and her co-conspirator would switch vehicles to avoid detection if the bank reported any suspicious activity. The group targeted parking lots in upscale neighborhoods for theft. They would wait for women to exit

2

their vehicles without their purses and then break into their vehicles.

Brantley then stated that Jermaine Jenkins provided her with the USFS victims' identification documents and that she was hired to pose as the women depicted in the photo IDs, often wearing a wig, in order to cash checks made out to these individuals with checkbooks stolen from other victims. Brantley further gave local law enforcement permission to search her hotel room, where she was keeping various stolen forms of identification that Jermaine Jenkins had given to her earlier that month and asked that she hold for him. Brantley stated that some of the items were used and some were not, and that Jenkins instructed her on the morning of January 25, 2012 to destroy them.

Brantley granted law enforcement permission to search her cellular telephone, where they found a contact listed as "Twin." Records provided by AT&T for that number revealed that it activated at cellular site towers in close proximity to each bank branch that Brantley "hit" on January 23, 2012 and January 25, 2012. The records further revealed that the phone activated at cellular site towers near Pisgah National Forest on January 2, 2012, the day of the vehicular break-ins.

On November 15, 2012, Elizabeth Ann Wolford was arrested in Concord, North Carolina for passing forged checks with stolen identification. Wolford told law enforcement that she was part of a criminal conspiracy where she and other females were passing stolen checks using stolen means of identification and returning the cash to their various male co-conspirators.

Further investigation confirmed that Wolford was captured by bank surveillance cameras on multiple occasions passing stolen checks – specifically, from September 18, 2012 – September 25, 2012 throughout Virginia; and on November 15, 2012 in Concord, NC, at which time she was arrested by local authorities. During her interview, Wolford said that three of her co-conspirators had been detained at a traffic stop in Virginia within the past two months, and had possessed, respectively, approximately $15,000, $14,000 and $8,800 in cash. Officers from the Chesterfield County Police Department in Virginia made a traffic stop of three individuals matching those details. Specifically, on September 19, 2012, Jermaine Jenkins, Cedric Jenkins, and Dorick Hunt were detained and had cash in those approximate amounts. The three were driving a rental vehicle at the time.

Wolford was released from custody on bond and continued to pass stolen checks with her co-conspirators. On February 7,

4

2013, she was arrested at her hotel room in Greenville, South Carolina by local authorities and agents with the United States Secret Service.

Wolford admitted that, since the summer of 2012, she had traveled to approximately six different states cashing stolen checks with various co-conspirators, including the four male defendants. She identified Cedric Jenkins, whom she knew as "Ced," and Kevin Keys, whom she knew as "Swagg," from photographs and provided a physical description for Jermaine Jenkins and Dorick Hunt. She knew Jermaine Jenkins as "Twin" and Dorick Hunt as "D."

Wolford stated that she would receive $100 to $150 for each stolen check that she cashed and the remaining proceeds were given to either Jermaine Jenkins, Cedric Jenkins, Dorick Hunt, Kevin Keys, or other unindicted co-conspirators, depending on which individual had provided her with the checks and went out with her to cash it. Wolford further stated that one of her male co-conspirators would give her cash to rent the vehicles she would use while passing the stolen checks. Wolford would drive one vehicle to pass the stolen check, while her co-conspirators would drive another vehicle, waiting nearby. After Wolford passed a check or attempted to pass one, she would meet

5

up with the other car to return the IDs and hand over whatever cash she had received from the bank.

Wolford also told law enforcement actions that she and her co-conspirators took to avoid apprehension. They used rental vehicles and would obscure the tags of the vehicle going through the teller lane. They would often switch vehicles after each pass or attempted pass of a stolen check. Jermaine Jenkins instructed Wolford on how to hold each check so as to not leave fingerprints. Cedric Jenkins had a police scanner "app" so he could listen to local law enforcement dispatch and determine whether the police were onto them. The male co-conspirators would give Wolford money and take her to a store to purchase wigs so that she could disguise herself in the teller lane.

After making this statement, Wolford led law enforcement to a location in the woods near her hotel room where she had watched Cedric Jenkins bury a plastic-wrapped package. The package contained stolen victim checks, driver's licenses, credit cards, debit cards, and passports. Many of these items were traced back to the victims of vehicular break-ins. For example, one of these victims, W.R., had reported a breaking and entering of her vehicle in Cabarrus County on January 21, 2013. Another victim, V.L., reported a breaking and entering of her vehicle on September 11, 2012 in Forsyth County. The victims'

6

accounts of the break-ins followed a similar pattern; many occurred at parking lots by fitness clubs, country clubs, or parks, and most happened in broad daylight. The package also included a piece of paper with handwritten personal-identifying information for the victim A.M. Wolford later stated that she and her co-conspirators referred to this as a "cheat sheet" and it was written for her use in going through the teller lane in case the teller asked a question regarding the victim's personal details and the means of identification were with the teller at that time. The format of the A.M. "cheat sheet" was very similar to that of the paper containing personal-identifying details for the victim K.H. recovered from Brantley at the time of her arrest on January 25, 2012.

Wolford gave law enforcement permission to search her cellular telephone, where they located a telephone number associated with the contact "Swagg." Records provided by Sprint Nextel Communications for that same number revealed that numerous telephone calls were exchanged between Wolford's telephone number and the number associated with "Swagg" throughout January and February of 2013.

On March 20, 2013, Cedric Jenkins, Dorick Hunt, and unindicted co-conspirator Jarvis Hunt were detained in a traffic stop at a rest stop in Granville County, North Carolina. They

7

were driving a rental vehicle at the time. Cedric Jenkins jumped out of the car and ran, but was apprehended by law enforcement. Near his flight path, officers found an envelope containing stolen forms of identification belonging to the victim E.B. and checks made out from the accounts of victims B.N and C.Q. to the victim E.B. The envelope also contained a piece of paper containing handwritten personal-identifying details for the victim E.B., similar in format to the "cheat sheet" for the victim K.H. recovered during the arrest of Brantley on January 25, 2012, and the "cheat sheet" for the victim A.M. recovered during the arrest of Wolford on February 7, 2013.

Law enforcement also recovered the following items from the three individuals and/or their vehicle: large amounts of cash;[1] a window center punch; a receipt for the purchase of the window center punch from a Lowe's Home Improvement Center in Huntersville, North Carolina; work gloves; an iPad; and three cellular telephones. Surveillance video from the Lowe's store showed Cedric Jenkins, Dorick Hunt, and Jarvis Hunt purchasing items at the self-service checkout lane at the time listed on the receipt recovered from the vehicle.

---

[1] Specifically, Cedric Jenkins had a total of $302, Dorick Hunt had a total of $6,550, and Jarvis Hunt had a total of $7,248.

Several days later, Dennis Brandon, owner of the land adjacent to the Granville County rest stop where Cedric Jenkins, Dorick Hunt, and Jarvis Hunt were detained, found a package containing various IDs, bank cards, and checkbooks at the fence separation the wood line of the rest stop from the parking area of the rest stop. This fence was the same one that Agent Freeman of the Granville County Sheriff's Office observed Cedric Jenkins jump when attempting to elude law enforcement. Brandon gave the package to the Granville County Sheriff's Office. It contained a Georgia driver's license and several bank cards belonging to the victim P.W. The package located outside of Wolford's hotel room on February 7, 2013 in Greenville, South Carolina contained a checkbook issued to that same victim.

Detective Avery Turner of the Concord Police Department conducted a forensic analysis of the iPad recovered in the vehicle. The analysis revealed that it was associated with the Google email account cedj954@gmail.com. The email inbox for this account contained various Facebook messages from Facebook friend "Kevin Keys" dating back to July 2012. Further, the birth date listed for "Kevin Keys" was identical to that of the defendant Kevin Keys in the instant matter. Finally, the email address listed for "Kevin Keys" in the iPad was swagg794@yahoo.com.

9

The internet browser history iPad also contained the following searches conducted and/or resultant websites visited, all on March 20, 2013:

- What city is the Univ of NC?

- Wealthy Neighborhoods of US cities

- Raleigh #7 richest #13 most literate

- what is the richest city in NC?

- Wealthy Neighborhoods of NC Cities

- NC's richest communities revealed here

- Highest income zip codes in NC

- Richest city in NC

The iPad also had a police scanner "app" entitled "CopRadio" and multiple pictures posted to the social media website Instagram featuring Cedric Jenkins and Kevin Keys posing holding large amounts of cash.

Detective Avery Turner of the Concord Police Department also conducted a forensic analysis of the Jarvis Hunt's cellular telephone. The analysis revealed further connections between the co-conspirators. For instance, in its address book, the telephone number for "Kevin Keys" was identical to the telephone number listed for "Swagg" in Wolford's cellular telephone. The analysis indicated that Jarvis Hunt had made numerous telephone

calls to "Swagg" and received calls in turn for the time period spanning January 1, 2013 through March 20, 2013, when his telephone was seized. Finally, the forensic analysis revealed that on March 20, 2013 at 12:18:26 PM, Jarvis Hunt texted the telephone number (954) 279-0097 the following message: "CED JUST JUMPED OUT WE GOT PULLED." Thirty-two seconds later, at 12:18:58 PM, Jarvis Hunt attempted to call "Swagg" but his call went unanswered.

On May 7, 2013, law enforcement with the Camden County Sheriff's Office in Georgia stopped a rental vehicle traveling southbound on I-95 for a traffic violation. Dorick Hunt was driving the car and Cedric Jenkins and Jarvis Hunt were passengers. All three men had outstanding warrants for their arrest. The men were all carrying large amounts of cash, totaling $11,491.

## II. LEGAL ISSUES

### A. Non-Hearsay Statements

The government intends to present, at trial, various out-of-court communications between the co-conspirators that are not offered for the truth of the matter asserted therein, but rather to show the relationship between the parties. Many of these communications are archived in the iPad that was seized in the March 20, 2013 traffic stop and associated with Cedric Jenkins.

Specifically, the iPad contains emails from the social media website indicating that Cedric Jenkins' various Facebook "friends" had a message for him or commented on his Facebook status. The emails contain the substance of the messages or comments.[2]

To the extent the defense charges that these messages are not sufficiently authentic, such arguments lack merit. It is well-settled that authentication only requires a jury to make a "factual determination of whether the evidence is that which the proponent claims." United States v. Vidacak, 553 F.3d 344, 349 (4th Cir. 2009) (internal quotation marks omitted). Often, proponents accomplish this by identifying distinctive details related to the documents, such as the author's name or email address or the fact that he received communications from known associates. See, e.g., United States v. Hassan, 742 F.3d 104, 133 n.25 (4th Cir. 2014) (government authenticated Facebook pages and user accounts by tracking them to defendants' mailing and email addresses).

Here, the Facebook communications found in the iPad have numerous identifying details tying them to Cedric Jenkins. First and foremost, the email address associated with the iPad

---

[2] To the extent that the fact of the communications themselves constitutes hearsay, the government will provide a 902(11) certification from Google, Inc. that the communications represent admissible business records, as discussed in further detail infra.

12

is cedj954@gmail.com, an address that includes the letters "ced" and "j." Wolford will testify that she knew Cedric Jenkins as "Ced." Further, his last name, Jenkins, begins with the letter "J." Likewise, every email from Facebook to this email address in the iPad addresses the recipient as Facebook user "Ced." Moreover, there are numerous communications from Facebook indicating that the Facebook users "Kevin Keys," "Jarvis Hunt," and "SlumDoggEnt" have communicated with him. Both Kevin Keys and Jarvis Hunt are alleged co-conspirators in this criminal conspiracy, and Cedric Jenkins was detained in a traffic stop with Jarvis two separate times, establishing their relationship. Both Wolford and Brantley knew Kevin Keys to be associated with the music studio Slum Dogg Entertainment.

In short, there is ample evidence that the messages are authentic and, because they are not being admitted for the truth of the matter asserted but rather just to show the relationship among the co-conspirators, should be properly admitted.

B. Statement Against Party Interest

The government intends to present, at trial, various out-of-courts statements of all three male defendants, made to Brantley, Wolford, and certain law enforcement officers. Under Fed. R. Evid. 804(b)(3), such statements are not excluded as hearsay if (1) the declarant is unavailable, (2) the statement

13

is genuinely adverse to the declarant's penal interest, and (3) corroborating circumstances clearly indicate the trustworthiness of the statement." United States v. Bumpass, 60 F.3d 1099, 1102 (4th Cir. 1995) (internal citations omitted), citing United States v. MacDonald, 688 F.2d 224, 233 (4th Cir. 1982). In evaluating whether the corroboration is sufficiently trustworthy, the Bumpass court identified six relevant factors:

> (1) whether the declarant had at the time of making the statement pled guilty or was still exposed to prosecution for making the statement, (2) the declarant's motive in making the statement and whether there was a reason for declarant to lie, (3) whether the declarant repeated the statement and did so consistently, (4) the party or parties to whom the statement was made, (5) the relationship of declarant with the accused, and (6) the nature and strength of independent evidence relevant to the conduct in question

60 F.3d at 1102.

Here, the government intends to introduce, through the testimony of Brantley, that Kevin Keys stated to an unknown individual on the telephone that his name was Kevin Keys. The government also intends to elicit, from Wolford, that Kevin Keys told her, in the context of discussing where he got the stolen IDs, that he had to go out "lurking" at a health club.

For both of these statements, the declarant, Kevin Keys, is unavailable if he asserts his Fifth Amendment rights. Both statements are against his penal interest, as both involve his

14

admission to either his identity or to the commission of a crime. Finally, both statements are sufficiently trustworthy under the Bumpass factors; the statements were made prior to any criminal prosecution of Keys, there was no reason for Keys to fabricate his identity or the fact that he had or was about to commit a crime, and Keys made these statements to trusted partners in crime who bore the same risk of punishment if caught.

Finally, the government will present independent corroboration for the statement. Regarding Keys' identity, Brantley and Wolford will testify that the individual named Kevin Keys is the same person they knew as "Swagg." Forensic evidence from the iPad will confirm that an individual listed as "Kevin Keys" in the address book had the same birthday as the defendant Kevin Keys and the email associated with "Kevin Keys" contained the word "swagg." Finally, regarding Keys' "lurking," the government will present ample evidence that the stolen IDs were taken from vehicles in breaking and enterings that occurred in many locations, including fitness clubs.

C. Statement of Co-Conspirator in Furtherance of the Conspiracy

Federal Rule of Evidence 801(d)(2)(E) provides that an out-of-court statement "made by the party's coconspirator during and

in furtherance of the conspiracy" does not constitute hearsay
and is thus admissible. To admit evidence under this rule, the
government must show, by a preponderance of the evidence: (1)
that there was a conspiracy involving the declarant and the
party against whom admission of the evidence is sought; and (2)
that the statements at issue were made in furtherance and in the
course of that conspiracy. See Bourjaily v. United States, 483
U.S. 171, 175 (1987); see also United States v. Smith, 441 F.3d
254, 261 (4th Cir.), cert. denied, 549 U.S. 903 (2006).

"Most courts, including the Fourth Circuit, construe the in
furtherance requirement so broadly that even casual
relationships to the conspiracy suffice to satisfy the exception
[to the hearsay rule]." Smith, 441 F.3d at 262 (internal
quotation and citation omitted). While the statements of co-
conspirators in furtherance of a conspiracy were distinguished
from inadmissible "idle conversation" in United States v.
Urbanik, 801 F.2d 692, 695-98 (4th Cir. 1986), this exception to
the exception has been narrowly construed. See United States v.
Graham, 711 F.3d 445, 452-53 (4th Cir.) (rejecting defendant's
contention that telephone conversation about his past debt for
marijuana was inadmissible "idle chatter"), cert. denied, 134 S.
Ct. 449 (2013); United States v. Howard, 115 F.3d 1151, 1156
(4th Cir. 1997) (rejecting defendant's contention that

16

conversations in jail with his nephew were inadmissible "idle chatter").

Here, the government intends to present at trial numerous statements made by the three male defendants to Brantley and Wolford in furtherance of their conspiracy. Specifically, the government intends to introduce, through Wolford, the following statements of Jermaine Jenkins:

- If Wolford got caught, he would "have her back" and he would pay for her lawyer.

- He had been passing stolen checks for a long time.

- The less Wolford knew, the better off she would be.

- Swagg was coming to work with Wolford [without him].

- He [Jermaine Jenkins] had passed stolen checks in the drive-through teller lane before, and so had Cedric Jenkins, Dorick Hunt, and Kevin Keys.

The government further intends to elicit testimony, from Wolford, regarding Cedric Jenkins' statement that they [the co-conspirators] needed to "find men to do these pieces," i.e., steal more IDs and checks.

All of these statements further the conspiracy, whether through assuring Wolford that her exposure to criminal sanctions will be lessened, advising her of a future "job," or trying to

17

assuage any fears she had about passing the stolen checks herself. Accordingly, they should be deemed admissible as statements made by co-conspirators in furtherance of the conspiracy.

D. Hearsay Exception – Self-Authenticating Evidence of Regularly-Kept Business Records

Federal Rule of Evidence 902(11) provides that an "original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person" is self-authenticating, provided that "the proponent [] give[s] an adverse party reasonable written notice of the intent to offer the record — and [] make[s] the record and certification available for inspection — so that the party has a fair opportunity to challenge [it]."

Here, the government advised counsel for the defendants in writing on June 25, 2014 that it intended to offer such certifications for business records provided by Avis Budget Group, Inc.; Dollar Thrifty Automotive Group; Red Roof Inn; Google, Inc.; and Lowe's Home Improvement Center. Likewise, on July 2, 2014, the government advised counsel for the defendants in writing that it intended to offer Fed. R. Evid. 902(11) certifications for business records provided by State Employees Credit Union; The Peoples Bank; OBX Bank, Wells Fargo Bank;

18

Renasant Bank; Pinnacle Bank; Allegacy Federal Credit Union; and First Federal Bank. On July 5, 2014, the government told defense counsel in writing that it intended to offer a Fed. R. Evid. 902(11) certification for business records provided by Sprint Nextel Communications and that this certification would be available for inspection upon request. Each time, the government advised that these certifications were available for inspection.

To date, none of the defendants have objected to these certifications or sought inspection of them. The trial in this matter commences in two business days. Should the government be required to call these authenticating witnesses to testify, many will be traveling from out of state from locations as far away as California. Accordingly, in the absence of any timely objection from the defense, the records provided by these businesses should be properly admitted as self-authenticating evidence that falls within the business records exception to the prohibition on hearsay.

To the extent that the defendants argue that these certifications violate their Sixth Amendment right to confront witnesses against them, they are wrong. The Fourth Circuit specifically ruled in United States v. Hassan, 742 F.3d 104, 133 n.25 (4th Cir. 2014) that such certifications may have been

19

prepared for trial but were not testimonial so as to violate the Supreme Court's ruling in Crawford v. Washington, 541 U.S. 36 (2004). Specifically, the court stated, "It would make no sense to require a records custodian to contemporaneously execute an affidavit attesting to the accuracy of a business record each time one is created or maintained, when there is no pending litigation or need for such a certification." See Hassan, 742 F.3d at 133 n.25.

Likewise, sister circuit courts have held that authenticating 902(11) statements are not testimonial. Specifically, the Tenth Circuit stated in United States v. Yeley-Davis, 632 F.3d 673 (10th Cir. 2011) that "[b]ecause the purpose of the certifications here was merely to authenticate the cell phone records—and not to establish or prove some fact at trial . . . they are not testimonial." Likewise, in United States v. Ellis, the Seventh Circuit concluded that "the written certification . . . is nontestimonial [because it is] too far removed from the 'principal evil at which the Confrontation Clause was directed' to be considered testimonial." See 460 F.3d 920, 927 (7th Cir. 2006) (quoting Crawford, 541 U.S. at 50). See United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005) (holding that "a routine certification by the custodian of a domestic public record . . . and a routine

20

attestation to authority and signature . . . are not testimonial in nature") (citation omitted); see also United States v. Anekwu, 695 F.3d 967, (9th Cir. 2012) (rejecting Crawford objection to self-authenticated foreign business records).

The government thus respectfully submits that the 902(11) certificates do not violate the defendants' right to confrontation and are admissible to authenticate certain business records.

This the 10th day of July, 2014.

> Respectfully submitted,
>
> RIPLEY RAND
> UNITED STATES ATTORNEY
>
>
> /S/ JOANNA G. MCFADDEN
> Assistant United States Attorney
> NYSB #4500948
> United States Attorney's Office
> Middle District of North Carolina
> P.O. Box 1858
> Greensboro, NC  27402
> Phone:  336/333-5351

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2014, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Wiliam Trivette, Esq.

Sophia Harvey, Esq.

Robert Broadie, Esq.

Respectfully submitted,

RIPLEY RAND
UNITED STATES ATTORNEY

/S/ JOANNA G. MCFADDEN
Assistant United States Attorney
NYSB #4500948
United States Attorney's Office
Middle District of North Carolina
101 S. Edgeworth St., 4th Floor
Greensboro, NC  27401
Phone:  336/333-5351